FOR PUBLICATION

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS & ST. JOHN

STEPHEN McCAULEY,          )
                           )
            Plaintiff,     )
                           )
        v.                 )
                           )     Civil No. 2005-188
UNIVERSITY OF THE VIRGIN   )
ISLANDS, SEAN GEORGES in his )
individual and official    )
capacities, DR. LAVERNE    )
RAGSTER, in her individual and)
official capacities, and JON )
and/or JANE DOES I through X, )
                           )
            Defendants.    )
_____)

ATTORNEYS:

**Darren J. Baptiste, Esq.**
St. Thomas, U.S.V.I.
    *For the plaintiff,*

**Marie E. Thomas-Griffith, Esq.**
St. Thomas, U.S.V.I.
    *For the defendants.*

MEMORANDUM OPINION

GÓMEZ, C.J.

    This matter was tried on May 11, 2009.  Pursuant to Rule
52(a) of the Federal Rules of Civil Procedure, the Court now
enters its findings of fact and conclusions of law.

## I.   <u>FINDINGS OF FACT</u>

At all times relevant to this action, Stephen McCauley ("McCauley") was a student at the University of the Virgin Islands ("UVI," or the "University").  Sean Georges ("Georges") is the director of student housing at UVI.  At all times relevant hereto, Dr. LaVerne E. Ragster ("Ragster"), was the president of the University.

McCauley first enrolled at the University in the fall of 2005.  During McCauley's tenure at the University, student life was governed by the University of the Virgin Islands Student Handbook 2005-2006 (the "Handbook"), which includes a Code of Student Conduct (the "Code") that lists prohibited behavior and sanctions for particular violations.  The Handbook was provided to McCauley during the first week of student orientation.

On the night of September 30, 2005, a group of UVI students, including McCauley, went to a local beach.  Sometime that night, two members of the group, Josh Carlson ("Carlson") and Jenna Piasecki ("Piasecki"), moved about ten to fifteen feet away from the group.  Piasecki then performed a sexual act upon Carlson.  Piasecki and Carlson later rejoined the group.  Thereafter, the group left the beach and returned to campus.

On October 1, 2005, Carlson was charged with the rape of Piasecki, based on the events that occurred the previous night on

the beach.  Also on October 1, 2005, McCauley and two friends

visited Piasecki's dormitory room to talk to her about the

alleged rape.

Piasecki thereafter complained to University officials that

McCauley had harassed her.  In October, 2005, Georges first

advised McCauley that Piasecki had made complaints of harassment

against him.  Georges also advised McCauley to stay away from

Piasecki if he wanted to avoid the commencement of University

judicial proceedings.  McCauley was subsequently approached a

second time in connection with Piasecki's complaints that he had

harassed her, and was warned by Jay Wiltshire and Robin Olson of

campus security to avoid all contact with Piasecki.

On or about November 7, 2005, McCauley received Notice of

Charges (the "November 2005 Notice"), which stated that he was

being charged by the University with failing to obey a lawful

directive of a University official and with hazing and

harassment.  The November 2005 Notice charges McCauley with

violating the following University policies:

> Hazing-Harassment:  Committing,  conspiring  to
> commit, or causing to be committed any act which
> causes or is likely to cause serious physical or
> mental harm or which tends to injure or actually
> injure, frightens, demeans, degrades or disgraces
> any person. This includes but is not limited to
> violation of the University's policies on hazing,
> sexual harassment or sexual assault.

> Failure to comply with the lawful direction of a
> University Official: Failure to comply with the
> directions of University or other law enforcement
> officers, or University officials in the proper
> performance of their duties.

(Plaintiff's Ex. 5, Notice of Charges 1, Nov. 7, 2005.)  McCauley
plead not guilty to the charges listed in the November 2005
Notice.

After receiving the November 2005 Notice, McCauley posted a
photograph of himself and Piasecki on a social networking website
called Myspace.com.  The picture bore the caption, "Fat sluts
need loving, too."  McCauley testified at trial that he posted
the photograph out of frustration and anger about the charges
against him, and that he intended the posting to offend Piasecki.
McCauley testified during the trial that the charges contained in
the November 2005, Notice stemmed from his posting of Piasecki's
picture on Myspace.com, as well as from allegations made by
Piasecki that McCauley made indecent remarks to her at an off
campus bar.

As a result of the harassment of Piasecki, McCauley was also
criminally charged with tampering with a witness.  He agreed to
pretrial intervention in 2006.  He also agreed to perform sixty
hours of community service for the tampering charge, and paid a
fee of $275 to Pretrial Intervention Services.

The University agreed to allow McCauley's criminal case to proceed to conclusion before it would commence any disciplinary hearings as a result of the November 2005, Notice. Consistent with that agreement, between November 7, 2005, and April, 2009, the University did not move forward on any proceedings related to the November 2005 Notice of Charges against McCauley.

On November 10, 2005, McCauley commenced the above-captioned action for damages and injunctive relief against UVI, Georges, Ragster, and Jon and/or Jane Does I through X, who are identified in McCauley's complaint as certain unnamed University students, employees, and officials involved with implementing disciplinary procedures against UVI students. Count One of McCauley's complaint alleges that the Defendants violated 42 U.S.C. § 1983 ("Section 1983") by enacting regulations that impermissibly infringe on McCauley's rights to free expression and due process of law. Count Two alleges that the Defendants violated Section 1983 by enacting regulations that impermissibly infringe on McCauley's right to freedom of association.

McCauley received a second Notice of Charges, dated March 31, 2009 (the "March 2009 Notice"), which listed the same charges as the November 2005 Notice, and also added a charge against McCauley for violating the University's drug and alcohol policy. Additionally, the March 2009 Notice stated that the charges were

based on: McCauley's visit to Piasecki's dormitory room on October 1, 2005; an allegedly harassing telephone call McCauley made to Piasecki on October 18, 2005; and McCauley's allegedly harassing conduct directed toward Piasecki at an off-campus bar on October 20, 2005.

On April 28, 2009, the University conducted its disciplinary proceedings against McCauley based on charges contained in the March 2009 Notice. McCauley was found guilty of Hazing-Harassment, and of Failure to Comply with a Lawful Directive of a University Official. McCauley was ordered by the University to write a letter of apology to Piasecki and to pay a fine in the amount of $200.

A bench trial in this matter was conducted on May 11, 2009. During the trial, McCauley indicated that he was challenging Paragraphs B, C, D, E, H and R of the Code. McCauley testified on his own behalf at the trial, describing the ways in which he was adversely affected by the challenged provisions of the Code. During the trial, McCauley argued that, by bringing charges against him based on the above-mentioned conduct, the University violated his First Amendment rights. After the close of the evidence, McCauley verbally moved to amend his Complaint to conform to the evidence. Specifically, he wished to include an

as-applied challenge[1] to the Code provisions in question.  At the

conclusion of the trial, McCauley stated that he wished to

dismiss the due process challenges alleged in his complaint.  The

Court construes that statement as a withdrawal of such claims.

On August 20, 2009, the Court granted McCauley's motion to

amend, and permitted McCauley to file a Third Amended Complaint

(the "Complaint").  In addition to Counts One and Two described

above, the Third Amended Complaint contains a third count,

embodying McCauley's as-applied challenge.  Count Three of the

Complaint, asserts, *inter alia,* that

> Plaintiff, by being subjected to actual or
> potential disciplinary proceedings for, inter
> alia, "[c]ommitting, conspiring to commit, or
> causing to be committed any act which causes or
> is likely to cause serious physical or mental
> harm or which tends to injure or actually
> injures, frightens, demeans, degrades or
> disgraces any person" has been unlawfully forced
> to limit and/or refrain from engaging in
> constitutionally protected speech both on and off
> campus out of fear that anything he may do or say
> may be actionable under the Code of Conduct.
>
>                     . . .
>
> Defendants, acting under color of territorial
> and/or federal law, have enacted regulations that
> deprived Plaintiff of his guaranteed and clearly

---

[1]  An as-applied challenge is "[a] claim that a law or
governmental policy, though constitutional on its face, is
unconstitutional as applied . . . ; a claim that a statute is
unconstitutional on the facts of a particular case or in its
application to a particular party." Black's Law Dictionary (8th
ed. 2004).

> established rights to freedom of expression,
> speech, and association under the First
> Amendment.

(Third Am. Compl. 12-13, ¶¶ 55, 57, May 21, 2009.)

## II.  CONCLUSIONS OF LAW

### A.  Standing

As a threshold matter, the Court must determine whether

McCauley has standing to bring this action. *See*, *e.g.*, *Addiction*

*Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 405 (3d Cir.

2005) ("As a threshold matter, . . . we must first address

whether [the plaintiff] has standing to bring its . . . claims in

federal court."). In addition to being a constitutional inquiry,

standing is also subject to certain prudential limitations that

reflect the need for judicial restraint.[2] *See*, *e.g.*, *Joint Stock*

_____

[2] The United States Court of Appeals for the Third Circuit
has articulated the test for assessing whether a party satisfies
prudential standing as follows:

> [Prudential limits] require that (1) a litigant
> assert his [or her] own legal interests rather
> than those of third parties, (2) courts refrain
> from adjudicating abstract questions of wide
> public significance which amount to generalized
> grievances, and (3) a litigant demonstrate that
> her interests are arguably within the zone of
> interests intended to be protected by the
> statute, rule or constitutional provision on
> which the claim is based.

*Davis v. Phila. Hous. Auth.*, 121 F.3d 92, 96 (3d Cir. 1997); *see
also Oxford Assocs. v. Waste Sys. Auth.*, 271 F.3d 140, 145-46 (3d
Cir. 2001).

*Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 179 (3d Cir. 2001) ("The requirements of prudential standing serve to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim.") (internal quotations omitted).

As a general matter, in order to establish Article III standing, a plaintiff

> must demonstrate "injury in fact" -- a harm that is both "concrete" and "actual or imminent, not conjectural or hypothetical." Second, he must establish causation -- a "fairly . . . traceable" connection between the alleged injury in fact and the alleged conduct of the defendant. And third, he must demonstrate redressability – a "substantial likelihood" that the requested relief will remedy the alleged injury in fact. These requirements together constitute the "irreducible constitutional minimum" of standing, which is an "essential and unchanging part" of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches.

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (internal citations omitted).

In the First Amendment context, however, the requirement that a litigant raise his own legal rights and interests is relaxed. *See Pennsylvania Prison Soc. v. Cortes*, 508 F.3d 156,

169 (3d Cir. 2007); *see also City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 756, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion . . . ."). As the United States Court of Appeals for the Third Circuit has explained,

> Under the First Amendment overbreadth doctrine, even though a party whose conduct could constitutionally be proscribed by statute may not normally be heard to complain that the statute . . . is so broad that it proscribes constitutionally protected conduct, courts will allow the party to raise the claims of others when protected speech is at issue. Courts do so out of concern that protected speech will be chilled by the statute.

*Service Employees Int'l. Union, Local 3 v. Municipality of Mt. Lebanon,* 446 F.3d 419, 423 (3d Cir. 2006); *see also Conchatta, Inc. v. Miller,* 458 F.3d 258, 263 (3d Cir. 2006) ("A litigant may challenge a statute as substantially overbroad under this principle 'even though the conduct of the [litigant] is clearly unprotected and could be proscribed by a law drawn with the requisite specificity.'" (quoting *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a

judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

However, litigants bringing such challenges must still satisfy the constitutional requirement of injury-in-fact by showing that "their own constitutionally unprotected interests will be adversely affected" by application of the rule in question. *Service Employees Int'l. Union, Local 3,* 446 F.3d at 423 (stating that "[w]e are not free to hear a party's facial challenge to a . . . regulation that is wholly inapplicable to the party"). In determining standing, the Court "must accept as true all material allegations set forth in [the plaintiff's] complaint and must construe those facts in favor of the plaintiff[]." *Mariana v. Fisher*, 338 F.3d 189, 205 (3d Cir. 2003) (citation omitted); *see also Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Here, McCauley brings both facial and as-applied challenges to certain provisions of the Code, claiming that they violate the First Amendment rights of free expression and association. It is undisputed that McCauley is a student enrolled at UVI, and as

such, is subject to the provisions of the Handbook and Code.
McCauley alleged that he studies in "an environment where almost
any speech or action can be actionable under the UVI code of
conduct." (Third Am. Compl. 7, ¶ 39, May 21, 2009.).  McCauley
further alleges that "[t]he UVI Code of conduct has a chilling
effect on [his] and other students' right to freely and openly
engage in appropriate discussions on theories, beliefs, ideas,
and to debate such ideas with persons holding opposing
viewpoints." (*Id*. at 7, ¶ 40.)  Furthermore, McCauley claims that
he has personally been harmed by the challenged Code provisions
because he has been subject to disciplinary action for violating
them.  Those assertions constitute harm that is more than merely
speculative.  McCauley therefore has standing to challenge the
constitutionality of provisions of the UVI Handbook and Code of
Conduct at issue in this case. *See, e.g., Bair v. Shippensburg
Univ.*, 280 F. Supp. 2d 357, 365 (M.D. Pa. 2003) (holding that a
student and recent graduate of a university has standing to bring
First Amendment challenges to the university's speech code based
on allegations that their "past, and . . . continuing, fears of
prosecution pursuant to the Code of Conduct have had a chilling
[e]ffect on their speech").

## B.    Merits

To succeed on a claim under Section 1983, a plaintiff must show that: (1) the defendants are "persons" within the meaning of the statute; (2) the defendants acted under color of law; and (3) their actions deprived him of rights secured by the Constitution or federal statutes. *See* 42 U.S.C. § 1983; *Anderson v. Davila*, 125 F.3d 148, 159 (3d Cir. 1997).  Thus, the Court must determine whether the defendants are "persons" within the meaning of Section 1983, whether they acted under color of law, and whether their actions deprived McCauley of his rights under the First Amendment.[3]

### 1.    "Persons" Under Section 1983

McCauley has brought Section 1983 claims against UVI, Georges, in his official and individual capacities, Ragster, in her official and individual capacities, and Jon and/or Jane Does I through X.  However, McCauley failed to identify and serve Jon and/or Jane Does I through X with the complaint and summons prior to trial.  McCauley has also not offered any reason why he could

---

[3]  Both parties devote the entire legal analysis in their proposed findings of fact and conclusions of law to establishing the third prong of the Section 1983 analysis.  They make no attempt to establish whether or not the defendants are "persons" within the meaning of Section 1983, or that they were acting under color of law when they committed the conduct relevant to this action.

not have identified and properly served these defendants.

Accordingly, the Court will dismiss McCauley's claims against Jon
and/or Jane Does I through X. *Parker v. United States*, 197 Fed.
Appx. 171, 173 n.1 (3d Cir. Sept. 5, 2006) (holding that John Doe
defendants in an inmate's *Bivens* action who were never identified
and served with the complaint were properly dismissed because the
inmate did not offer any reason why he could not have identified
and properly served them) (unpublished).  The Court will consider
McCauley's claims to be lodged against UVI, Georges, in his
official and individual capacities, Ragster, in her official and
individual capacities.

   **i.   UVI**

   Neither the Virgin Islands government, nor its employees
acting in their official capacities, are "persons" for purposes
of liability under Section 1983, *Brow v. Farrelly,* 994 F.2d 1027,
1037 (3d Cir. 1993).  Since the Virgin Islands government is not
a "person," entities functioning as "arms" or "alter egos" of the
territory will be similarly immune from liability under Section
1983. *Eddy v. V.I. Water and Power Auth.,* 955 F. Supp. 468, 476
(D.V.I. 1997).

   Where a state college or university is considered an "arm of
the state," courts have held that the institution may not be sued
for monetary or injunctive relief under Section 1983. *See, e.g.,*

*Gaby v. Bd. of Trustees of Community Technical Colleges,* 348 F.3d 62, (2d Cir. 2003) (holding that the plaintiff failed to state a claim for injunctive relief under Section 1983 against the board of trustees of a state college because "it is clear that the Board of Trustees, as an entity, is not a state official"); *McLaughlin v. Bd. of Trustees*, 215 F.3d 1168, 1172 (10th Cir. 2000) (holding that a suit seeking injunctive relief against a state college board of trustees failed to state a claim against a "person" for purposes of Section 1983, and noting that "[i]f [the plaintiff] had sued a state official instead of the Board, he could have argued the viability of his claim for prospective injunctive relief . . . ."); *Kaimowitz v. Bd. of Trustees*, 951 F.2d 765, 767 (7th Cir. 1992) (holding, in an action seeking declaratory and monetary relief against the Board of Trustees of the University of Illinois, that "a state university is not a person within the meaning of § 1983 and therefore not subject to suits brought under § 1983").  Thus, the Court must decide whether UVI is an "alter ego" or "arm of the state" in order to determine whether UVI qualifies as a "person" for purposes of Section 1983 liability.[4]

_____

[4]  The Court is unaware of any binding legal authority on the issue of whether UVI is an "arm of the state" for purposes of Section 1983 liability.  However, in *Bell v. University of the V.I.,* 2003 WL 23517144 (D.V.I. Nov. 19, 2003), this Court held that the plaintiff could not bring a Section 1983 claim against

An entity is properly characterized as an "arm of the state" "when a judgment against it would have essentially the same practical consequences as a judgment against the State itself." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 545-46 (3d Cir. 2007) (citation and quotations omitted). It is appropriate to consider three major criteria when determining whether an entity is an "arm" or "alter ego" of the state: (1) the status of the entity under Virgin Islands law; (2) whether the payment of the judgment would come from the Territory, and; (3) the degree of autonomy enjoyed by the entity. *See Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006). Each of the above three criteria is equally important. *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239-40 (3d Cir. 2005) (rejecting the primacy historically given to the funding factor).

### a.    Status of UVI Under Virgin Islands Law

The analysis of an entity's status under Virgin Islands law is broken into four sub-factors: (a) whether the entity can sue or be sued in its own right; (b) whether the entity is immune

---

a UVI professor in her official capacity because the professor was "an employee of the Territory of the Virgin Islands." *Id.* at *2. As such, the Court concluded that "Plaintiff can only bring a claim for money damages under 42 U.S.C. § 1983 against [the professor] as an individual." *Id.* The Court in *Bell* also stated that "Plaintiff is barred from bringing a 42 U.S.C. § 1983 claim against Defendant UVI." *Id.* at *3. The opinion in *Bell* contains no further analysis or discussion of the issue.

from territorial taxation; (c) whether the entity is separately

incorporated; and (d) how the territory treats the entity

generally. *Febres,* 445 F.3d 227, 230 (3d Cir. 2006).  With

respect to UVI, these factors do not clearly weigh in one

direction.

On one hand, UVI has several attributes of an independent

entity.  Title 17, chapter 33 of the Virgin Islands Code

("Chapter 33") outlines the scope of UVI's authority.  The

University has "perpetual succession" and the power to "sue and

be sued" under territorial law. 17 V.I.C. § 454(a).  UVI also has

the power to own and transfer property, to enter into contracts,

and to contract debts. *Id.* at §454(a), (c).  Finally, UVI's

activities must comply with "any law made . . . generally

applicable to independent instrumentalities of the Government of

the United States Virgin Islands . . . ." *Id*. at 453(b).

On the other hand, UVI has many characteristics of an alter

ego of the sovereign.  Chapter 33 created UVI as "an

instrumentality of the Government of the United States Virgin

Islands[.]" 17 V.I.C. § 451.[5]  The property UVI holds for

authorized purposes, as well as the bonds it issues, are exempt

from Virgin Islands taxes. *See id.* at § 459(b).  All of UVI's

_____

[5]  However, the Board of Trustees of UVI was created as " a
body politic and corporate." 17 V.I.C. § 453.

property and funds are exempt from judicial process. *See id.* at §
459(a).

Though UVI has many attributes associated with independence,
the factors relating to UVI's status under territorial law weigh
toward the conclusion that UVI is an arm of the state.

### b.    Autonomy

The autonomy factor requires an evaluation of the degree of
independence from the Virgin Islands government exercised by UVI.
*See Bowers v. National Collegiate Athletic Ass'n,* 475 F.3d 524,
548 (3d Cir. 2007) (explaining the focus of the autonomy factor).

A seventeen-member Board of Trustees (the "Board") controls
UVI.  The Board consists of the Chairman of the Board of
Education of the Virgin Islands, the Commissioner of Education,
the President of the University, at least six individuals who
have been residents of the Virgin Islands for a minimum of five
years, a student member, a full-time teaching faculty member, and
an alumni member. *See* 17 V.I.C. § 455.

Several facts support the conclusion that UVI is an
instrumentality of the state.  For example, the governor of the
Virgin Islands, with the advice and consent of the Legislature of
the Virgin Islands, appoints the majority of the Board members.
*See id*. at § 455(2).  The governor may remove any Board member
appointed by him for cause. *See id.*  Although UVI has the power

to apply for and accept funds from public and private sources for authorized purposes, all allotment requests for such funds must be made " by direct application to the Commissioner of Finance." *Id*. at § 454(e). The property UVI holds for authorized purposes is considered "public property used for essential public and governmental purposes." *Id*. at § 459(b). Similarly, the bonds issued by UVI "are declared to be issued for an essential public and government purpose . . . ." *Id.* at § 460(e). All money acquired by the University must be deposited and maintained in an account administered in accordance with the Commissioner of Finance of the Virgin Islands.[6] *See id.* at 494-95. The Act also requires UVI to account to the Commissioner of Finance for all money it acquires. Additionally, the Board must report to the Governor annually regarding the University's fiscal activities, a description of the activities of the University including class enrollments, an outline of plans for the future, and requests for additional legislation it deems necessary to accomplish its programs and policies. *Id.* at § 497.

Weighing toward independent status, the University is authorized to prescribe regulations for its own governance, to

---

[6] The Virgin Islands Code established a The University of the Virgin Islands Fund (the "Fund") for the purpose of receiving, managing, controlling, and disposing of money ro property on behalf of UVI.

employ a President, aa well as other professional and
nonprofessional personnel. *See id.* at § 454(d). The President of
the University "shall serve as its chief executive officer, and
shall have the power to appoint and remove all professors,
lecturers, instructors, and all other professional and
nonprofessional personnel in accordance with rules and
regulations promulgated by the Board." *Id.* at § 457(a). Chapter
33 grants UVI the power to make its own regulations, acquire
debt, contract on its ow behalf, and to acquire, manage, and
dispose of real and personal property. *Id.* at § 454(a), (c), (d).
The University is also authorized to issue bonds "in its
discretion," and to execute numerous types of pledges and
covenants in connection therewith. *See id.* at §§ 460, 462.

The Court recognizes that UVI enjoys a degree of autonomy.
On balance, however, the autonomy criteria weigh in favor of the
conclusion that UVI is an "arm of the state." *See, e.g., Peters
v. Del. River Port Auth.*, 16 F.3d 1346, 1350-52 (3d Cir. 1994)
(holding that, despite the agency's separate corporate existence,
power to enter into contracts, hold property, and set and collect
tolls, "the significant control the states have through
appointing the [agency]'s Board weighs slightly in favor of the
[agency]'s being an alter ego of the states."); *Fitchik*, 873 F.2d
at 663 (finding that the autonomy factor only slightly favored

immunity where three out of seven Commissioners were members of the state's executive branch, the board was required to deliver minutes of its meetings to the Governor, and the Governor had veto power over the board's actions).

### c.    Funding

The funding criteria serve to determine whether the judgment would ultimately be satisfied using Virgin Islands government funds. *See Independent Enterprises, Inc.,* 103 F.3d at 1173 (citing *Fitchik*, 873 F.2d at 659).  Three sub-factors comprise this inquiry: (1) whether payment would come from the territory's treasury, (2) whether the entity has the funds to satisfy the judgment, and (3) whether the Virgin Islands government has immunized itself from responsibility for the entity's debts. *See id.*

With respect to the first sub-factor, the following facts suggests that the payment would not deplete local government funds.  A separate Fund is maintained to receive, manage, and dispose of the University's money. *See id.* at §§ 491-97.  The University is empowered to issue such types of bonds as it "may determine" "for any of its corporate purposes or projects." *Id.* at 460(a).  It is also authorized to issue "refunding bonds for the purpose of paying or retiring bonds previously issued . . . ." *Id.*  The Board of Trustees is authorized to "make every effort

to secure gifts, grants, and loans to the University of the

Virgin Islands Fund" from various sources. *Id.* at § 496.

However, such gifts, grants and loans are to be used for the

purposes specified by the donor. *Id.* Additionally, the fact that

the legislature of the Virgin Islands has authorized the annual

appropriation of government funds for purposes of the University

suggests that payment of a judgment against UVI might deplete the

territory's treasury.

As to the second sub-factor, none of the parties have

presented any evidence of UVI's ability to satisfy a money

judgment against it. It is unclear whether  would have

sufficient assets to pay a potential judgment without asking for

assistance from the Virgin Islands government. *Cf. Christy,* 54

F.3d at 1146-47 (noting that even in the absence of evidence

regarding an agency's budget, the court could conclude that an

agency with the power to raise rates could raise revenues to

satisfy a judgment without asking for state assistance).

As to the third sub-factor, the Virgin Islands legislature

has explicitly attempted to immunize the territorial government

from liability for UVI's financial obligations in connections

with its bonds. Title 17, section 460(d) of the Virgin Islands

Code ("Section 460(d)") provides:

> The bonds and other obligations of the University
> (and the bonds and obligations shall so state on
> their face), shall not be a debt of the Virgin
> Islands (which may be referred to as the 'state')
> or any political subdivision thereof and neither
> the Virgin Islands nor any political subdivision
> thereof shall be liable thereon, nor in any event
> shall such bonds or obligations be payable out of
> any funds or properties other than those of the
> University, and shall not constitute an
> indebtedness within the meaning of any
> constitutional or statutory debt limitation or
> restriction.

17 V.I.C. § 460(d). Indeed, while the Virgin Islands government

(or any political subdivision) is authorized to assist UVI in

various ways, the Court is unaware of any authority suggesting

that the territorial government would have any affirmative

responsibility to satisfy UVI's financial obligations.

Therefore, the third sub-factor disfavors "arm of the state"

status. *See, e.g., Bowers,* 475 F.3d at 547 ("[I]f a State is not

under a legal *obligation* to satisfy a judgment, then any increase

in expenditures in the face of an adverse judgment is considered

a voluntary or discretionary subsidy not entitled to Eleventh

Amendment protections.") (emphasis in original); *Christy,* 54 F.3d

at 1147 ("Although the Commonwealth might well choose to

appropriate money to the Commission to enable it to meet a

shortfall caused by an adverse judgment, such voluntary payments

by a state simply do not trigger [Eleventh Amendment] immunity."

(citation and quotation omitted)).

Accordingly, the funding factor weighs slightly against the conclusion that UVI is an "arm of the state." *See, e.g., Christy,* 54 F.3d at 1147-48 (3d Cir. 1995) (finding that the funding factor disfavored immunity where a judgment against the agency would not be paid from the state's treasury, the Court could presume the agency had or could raise sufficient funds to pay the judgment, and the state would not be obligated to pay a potential judgment against the agency); *Ballentine v. V.I. Port Auth.,* 955 F. Supp. 480, 483-84 (D.V.I. 1997) (finding that the funding criteria weighed against immunity where: a judgment against VIPA would not technically affect the funds in the Virgin Islands treasury, it was unsettled whether VIPA had sufficient funds to pay a judgment, and the government had attempted to immunize itself against VIPA's liabilities).

### d.   **Totality of the Factors**

On balance, the totality of the factors demonstrates that UVI is an "arm of the state," so it is entitled to sovereign immunity.  Consequently, UVI is not considered to be a "person" subject to liability under Section 1983.  Accordingly, the Court will dismiss McCauley's claims against UVI.

### ii.  **Georges and Ragster**

As stated above, McCauley has brought Section 1983 claims against Georges and Ragster in both their official and individual

capacities.  It is clear that Georges and Ragster, in their
individual capacities, are considered to be "persons" for
purposes of Section 1983 liability. *Cf. Barton v. Curtis*, 497
F.3d 331 (3d Cir. 2007) (explaining that even state officials
sued in their individual capacities are considered "persons"
within the meaning of Section 1983).

Regarding McCauley's official-capacity claims against
Georges and Ragster, because the Court has already determined
that UVI is an "arm of the state" immune from damage liability
under Section 1983, employees of UVI acting in their official
capacities will be similarly immune from damage liability under
Section 1983. *See Nibbs v. Roberts*, 31 V.I. 196, 208 (D.V.I. App.
Div. 1995) (holding that an officer of the Virgin Islands
government is subject to damage liability under Section 1983 in
his individual capacity only, not in his official capacity).
Therefore, to the extent McCauley brings claims for damages
against Georges and Ragster in their official capacities, such
claims must fail.  On the other hand, to the extent McCauley
seeks prospective injunctive relief against Georges and Ragster
in their official capacities, such claims may proceed "because
official-capacity actions for prospective relief are not treated
as actions against the State." *Will v. Michigan State Dep't of*

*Police*, 491 U.S. 58, 71 & n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (quotation omitted).

## 2. Color of Law

The Supreme Court has held that an individual is acting under color of state law when exercising power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk County v. Dodson*, 454 U.S. 312, 317-18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quotation omitted). Thus, "state employment is generally sufficient to render the defendant a state actor." *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quotation omitted). "For purposes of a section 1983 action, a defendant necessarily 'acts under color of state law when he abuses the position given to him by the State.'" *Hayut v. State Univ. of New York*, 352 F.3d 733, 744 (2d Cir. 2003) (quoting *West*, 487 U.S. at 50; *see also Christian v. Belcher*, 888 F.2d 410, 414 (6th Cir. 1989) ("[B]efore a defendant may be held liable under section 1983, that defendant must first possess power by virtue of state law, then misuse that power in a way that violates federal constitutional rights.").

Here, it is undisputed that Georges is the director of student housing at UVI, and that Ragster is the president of UVI. There is no evidence in the record to suggest that Georges or

Ragster committed any conduct in connection with this matter that could reasonably be construed as anything but actions done under the authority vested in them by virtue of their employment with UVI. Indeed, McCauley's claims against Georges and Ragster are based on their involvement in enacting regulations in the University Handbook and Code. Under these circumstances, Georges and Ragster may be considered to be state actors for purposes of Section 1983. *Cf. Hayut*, 352 F.3d at 744 ("A professor at a state university is vested with a great deal of authority . . . by virtue of that position. When a professor misuses that authority in the course of performing his duties, he necessarily acts under color of state law for purposes of a section 1983 action.").

### 3. Deprivation of Rights

#### i. Facial Challenges

McCauley contends that the conduct of Georges and Ragster (together, the "Defendants") in enacting the regulations contained in the Handbook and Code infringed upon his First Amendment rights of free speech, expression, and association.

#### a. Count One: Freedom of Speech and Expression

In Count One of his Complaint, McCauley contends that certain provisions of the Code violate his First Amendment rights of free speech and expression because they are facially overbroad.

As the United States Court of Appeals for the Third Circuit

has explained, under the First Amendment overbreadth doctrine,

> A regulation of speech may be struck down on its
> face if its prohibitions are sufficiently
> overbroad-that is, if it reaches too much
> expression that is protected by the Constitution.
> The . . . policy can be found unconstitutionally
> overbroad if "there is a 'likelihood that the
> statute's very existence will inhibit free
> expression'" to a substantial extent.

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243,

258-59 (3d Cir. 2002) (citations omitted). However, the Third

Circuit has also cautioned that "most cases alleging

unconstitutional enforcement of a public school's disciplinary

policies, like other laws, are best addressed when (and if) they

arise, rather than prophylactically through the disfavored

mechanism of a facial challenge." *Id.* (quotations omitted). "For

these reasons, courts will not strike down a regulation as

overbroad unless the overbreadth is 'substantial in relation to

the [regulation's] plainly legitimate sweep.'" *Id.* (quoting

*Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37

L.Ed.2d 830 (1973)). "Furthermore, in response to an overbreadth

challenge, a policy can be struck down only if no reasonable

limiting construction is available that would render the policy

constitutional." *Id.* Thus, "every reasonable construction must

be resorted to, in order to save a statute from

unconstitutionality." *Saxe v. State Coll. Area Sch. Dist.*, 240

F.3d 200, 211 (3d Cir. 2001).

In addressing First Amendment challenges in the educational

context, it is important to note that there is a difference

between the extent to which a school may regulate speech in a

public university setting as opposed to a public elementary or

high school setting.  As the United States Court of Appeals for

the Third Circuit has explained, "in the context of a public

elementary or high school, the special needs of school discipline

are an important consideration in regulating speech." *DeJohn v.

Temple Univ.,* 537 F.3d 301, 315-16 (3d Cir. 2008) (quotations

omitted).  However, public colleges and universities are granted

less leeway to restrict speech than public elementary and high

schools. *See id.*

The Supreme Court of the United States addressed the scope

of a student's right to free speech while in school in *Tinker v.

Des Moines Independent Community School District,* 393 U.S. 503,

89 S.Ct. 733, 21 L.Ed.2d 731 (1969).  In that case, a group of

high school and junior high school students were suspended from

school for wearing black armbands to protest the Vietnam war.

The students sued the school district, challenging their

suspension on First Amendment grounds.  The Supreme Court held

that the wearing of the arm bands was constitutionally protected

speech.  The Court explained:

> The school officials banned and sought to punish
> petitioners for a silent, passive expression of
> opinion, unaccompanied by any disorder or
> disturbance on the part of petitioners. There is
> here no evidence whatever of petitioners'
> interference, actual or nascent, with the
> schools' work or of collision with the rights of
> other students to be secure and to be let alone.
> Accordingly, this case does not concern speech or
> action that intrudes upon the work of the schools
> or the rights of other students.

*Id.* at 504.

"Under *Tinker*, then, regulation of student speech is

generally permissible only when the speech would substantially

disrupt or interfere with the work of the school or the rights of

other students. . . . *Tinker* requires a specific and significant

fear of disruption, not just some remote apprehension of

disturbance." *Saxe,* 240 F.3d at 211.

However, there are exceptions to *Tinker*'s requirement of a

threat of substantial disruption.  First, in *Bethel School*

*District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92

L.Ed.2d 549 (1986), the Supreme Court held that "schools, as

instruments of the state, may determine that the essential

lessons of civil, mature conduct cannot be conveyed in a school

that tolerates *lewd, indecent, or offensive* speech and

conduct[.]" *Id.* at 683 (emphasis added).  "According to *Fraser,*

then, there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech in school. *Fraser* permits a school to prohibit words that 'offend for the same reasons that obscenity offends.'" *Saxe,* 240 F.3d at 213.

Second, in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Supreme Court held that a school may "exercis[e] editorial control over the style and content of student speech in *school-sponsored expressive activities* as long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273 (emphasis added). This standard "governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself." *Saxe,* 240 F.3d at 213-14.

Speech falling outside the categories of lewd, vulgar or profane language permitted to be regulated under *Fraser,* or school-sponsored speech permitted to be regulated under *Hazlewood* is subject to *Tinker's* general rule that student speech may be regulated only if it would substantially disrupt the school operations or interfere with the rights of others. *See Saxe,* 240 F.3d at 214.

Before proceeding to analyze the particular Code provisions at issue in this case, it is also important to keep in mind that "non-expressive, physically harassing conduct is entirely outside

the ambit of the free speech clause[.]" *DeJohn,* 537 F.3d at 316.

However "[w]hen laws against harassment attempt to regulate oral

or written expression on such topics, however detestable the

views expressed may be, we cannot turn a blind eye to the First

Amendment implications. 'Where pure expression is involved,'

anti-discrimination law 'steers into the territory of the First

Amendment.'" *Saxe*, 240 F.3d at 206 (quoting *DeAngelis v. El Paso*

*Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995)).

As the Third Circuit has explained, "there is no harassment

exception to the First Amendment's Free Speech Clause; that is,

we have found no categorical rule that divests 'harassing' speech

. . . of First Amendment protection." *DeJohn,* 537 F.3d at 316

(quoting *Saxe,* 240 F.3d 210). Indeed, "'[h]arassing' or

discriminatory speech, although evil and offensive, may be used

to communicate ideas or emotions that nevertheless implicate

First Amendment protections." *Saxe*, 240 F.3d at 209. Thus, "[i]f

there is a bedrock principle underlying the First Amendment, it

is that the government may not prohibit the expression of an idea

simply because society finds the idea offensive or disagreeable."

*Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d

342 (1989).

In sum, content-based restrictions may be permissible when

the content classification merely "happens to be associated with

particular 'secondary effects' of the speech, so that the
regulation is 'justified without reference to the content of the
. . . speech.'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 112
S.Ct. 2538, 120 L.Ed.2d 305 (1992). However, "the government may
not prohibit speech under a 'secondary effects' rationale based
solely on the emotive impact that its offensive content may have
on a listener: 'Listeners' reactions to speech are not the type
of 'secondary effects' we referred to in Renton. . . . The
emotive impact of speech on its audience is not a 'secondary
effect.' " *Saxe*, 240 F.3d at 209 (quoting *Boos v. Barry*, 485 U.S.
312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *see also United
States v. Playboy Entertainment Group*, 529 U.S. 803, 120 S.Ct.
1878, 1885, 146 L.Ed.2d 865 (2000) ("The overriding justification
for the regulation is concern for the effect of the subject
matter on [listeners]. . . . This is the essence of content-based
regulation."); *Forsyth County v. Nationalist Movement*, 505 U.S.
123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Listeners'
reaction to speech is not a content-neutral basis for
regulation.").

With these principles in mind, the Court turns to the
question of whether the challenged Code provisions
unconstitutionally chill the rights of McCauley and other UVI
students to free speech and expression.

## I. "Aiding and Abetting or Complicity in Threatening Bodily Harm and/or Committing Bodily Harm to a Person."

McCauley first challenges Section IV, paragraph C of the Code ("Paragraph C"), which prohibits as a major infraction "Aiding and Abetting or Complicity in Threatening Bodily Harm and/or Committing Bodily Harm to a Person."[7]  Paragraph C states, *inter alia*, that:

> Students present during the commission of an act(s) by another which constitutes [inflicting or threatening to inflict bodily harm or coercing or restraining any person while on or about University premises] and who fail to report such act(s) to the proper University authorities shall be guilty of complicity to commit bodily harm to a person.

(Plaintiff's Ex. 1, Handbook and Code 36, ¶ C.)

During the trial, McCauley articulated his challenge to Paragraph C as follows:

> [I]t's possible for someone to be present when an act is committed and not be aware that this act is a violation.  And in that case that person would then be in violation of the provisions of the Code of Conduct.

---

[7]  In their proposed findings of fact and conclusions of law, both parties refer to paragraph C of the general infractions section of the Code, rather than paragraph C of the major infractions section.  However, McCauley's Complaint makes no mention of paragraph C of the general infractions section, but rather challenges paragraph C of the major infractions section.  Furthermore, at trial, McCauley specifically testified about his view of paragraph C of the major infractions section.

(Trial Tr. 79, May 11, 2009.)

With respect to Paragraph C, McCauley has failed to meet his burden of persuading the Court that Paragraph C adversely impacts the rights of McCauley or any other student to free speech and expression. Accordingly, the Court will dismiss Count One of the Complaint insofar as it relates to Paragraph C.

## II. "Hazing-Harassment"

McCauley next challenges Section IV, paragraph E of the Code ("Paragraph E"), which prohibits "Hazing-Harassment" as a major infraction. "Hazing-Harassment" is defined to mean:

> Committing, conspiring to commit, or causing to be committed any act which causes or is likely to cause serious physical or mental harm or which tends to injure or actually injures, frightens, demeans, degrades or disgraces any person. This includes but is not limited to violation of the University policies on hazing, sexual harassment, or sexual assault.

(Plaintiff's Ex. 1, Handbook and Code 37, ¶ E.)

This provision is most easily analyzed when broken down into elements. It bans (1) committing, conspiring to commit, or causing to be committed *any act*; (3) which either: (i) causes or is likely to cause serious physical or mental harm, or (ii) tends to injure or actually injures, frightens, demeans, degrades or disgraces any person.

The term "act" may be reasonably interpreted to encompass expressive speech, not just physical conduct. *See, e.g., Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370 (M.D. Pa. 2003) ("[T]he provision of the Code prohibiting acts of intolerance directed at others . . . could certainly be interpreted as prohibiting speech that is protected by the First Amendment."). The provision can therefore be applied to restrict speech based on its content. Indeed, under Paragraph E, speech that tends to injure, frighten, demean, disgrace, or degrade is prohibited, whereas speech that people find unobjectionable is allowed.

Paragraph E clearly encompasses more than lewd, vulgar, or profane language. It is also not limited to school-sponsored speech. As such, Paragraph E must satisfy the *Tinker* standard for restrictions on speech.

In *DeJohn v. Temple University,* 537 F.3d 301 (3d Cir. 2008), the Third Circuit addressed the issue of whether a University's sexual harassment policy, which bears some resemblance to the Hazing-Harassment policy contained in Paragraph E, passed constitutional must under *Tinker*. The Temple policy provided:

> For all individuals who are part of the Temple community, all forms of sexual harassment are prohibited, including the following: an unwelcome sexual advance, request for sexual favors, *or other expressive, visual or physical conduct of a sexual or gender-motivated nature when . . . (c) such conduct has the purpose or effect of*

> *unreasonably interfering with an individual's*
> *work, educational performance, or status; or (d)*
> *such conduct has the purpose or effect of*
> *creating an intimidating, hostile, or offensive*
> *environment.*

*Id.* at 316.

The Third Circuit criticized that language, stating that

> the policy's use of "hostile," "offensive," and
> "gender-motivated" is, on its face, sufficiently
> broad and subjective that they could conceivably
> be applied to cover any speech of a
> "gender-motivated" nature "the content of which
> offends someone." This could include "core"
> political and religious speech, such as gender
> politics and sexual morality. Absent any
> requirement akin to a showing of severity or
> pervasiveness-that is, a requirement that the
> conduct objectively and subjectively creates a
> hostile environment or substantially interferes
> with an individual's work-the policy provides no
> shelter for core protected speech.

*Id.* at 317-18. Ultimately, the court found that Temple's policy

was incapable of a limiting construction, and struck down the

policy as unconstitutional.

Like the sexual harassment policy at issue in *DeJohn,*

Paragraph E can clearly be applied to restrict speech on the

basis that its content tends to frighten, demean, degrade, or

disgrace another person. A broad array of speech could fall

within that provision. The restriction contained in Paragraph E

is not limited to speech that occurs on the University campus,

but rather covers any speech by a UVI student, without regard to

location.  Significantly, Paragraph E restricts speech based on
its tendency to cause certain emotional reactions in others.  The
terms "frighten, demean, degrade, [and] disgrace" are subjective,
as some people may feel frightened, demeaned, degraded or
disgraced by a comment that other students find perfectly
acceptable.  As in *DeJohn,* there is no requirement of
pervasiveness or severity in this prong of Paragraph E.
Paragraph E therefore covers any speech, the content of which
offends another.  Furthermore, the parties have not offered, nor
is the Court aware of, any narrowing construction of the
provision that would save it from this overbreadth challenge.

Therefore, in order to pass constitutional muster, the
University must offer a "particularized reason as to why it
anticipates substantial disruption from the broad swath of
student speech prohibited under the Policy." *Saxe,* 240 F.3d at
217; *see also DeJohn,* 537 F.3d at 317 (explaining that "a school
must show that speech will cause actual, material disruption
before prohibiting it").  Indeed, *Tinker* requires the University
to put forth facts which might reasonably have led school
authorities to forecast "a specific and significant fear of
disruption, not just some remote apprehension of disturbance."
*Saxe*, 240 F.3d at 214; *see also Sypniewski v. Warren Hills
Regional Bd. of Educ.,* 307 F.3d 243, 265 (3d Cir. 2002) ("What is

required is that the school has a well-founded fear that the material at issue would substantially disrupt or interfere with the work of the school or the rights of other students." (quotation omitted)).

"*Tinker* does not require disruption to have actually occurred." *Lowery v. Euverard*, 497 F.3d 584, 591 (6th Cir. 2007). Rather, the inquiry focuses on whether the school has demonstrated that its forecast of substantial disruption is reasonable under the circumstances by determining whether "the banned conduct would likely trigger disturbances such as those experienced in the past." *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008). Thus, while the particular type of speech in question need not have already caused disturbance, the institution's background and history of turmoil is nonetheless relevant in determining whether its forecast of future substantial disruption is reasonable. *See Sypniewski,* 307 F.3d at 266 (noting that "[e]specially in the school setting, restrictive policies are appropriately targeted to the special features of the given context").

Here, the University points to McCauley's actual intimidation and harassment of Piasecki as an example of the type of disruption it seeks to prevent with the Hazing-Harassment policy in Paragraph E. Aside from the conduct giving rise to the

instant case, the University has pointed to no other history of turmoil to form a basis for predicting that speech covered by Paragraph E would cause future disturbance. *Cf. Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 372 (M.D. Pa. 2003) (holding that a university failed to show a substantial threat of disturbance because it "made no attempt to demonstrate that Shippensburg University suffers from a history of conflict such that an expectation of disruption may be characterized as 'well-founded'"). In fact, the University does not even assert that it forecasts a threat of substantial disturbance in the future as a result of such speech.

Moreover, as the Third Circuit explained in *DeJohn,* "[u]nder *Tinker*, students may express their opinions, even on controversial subjects, so long as they do so 'without colliding with the rights of others.'" *DeJohn,* 537 F.3d at 319 (quoting *Tinker,* 393 U.S. at 512). While it is clear that a school has a compelling interest in preventing harassment, "unless harassment is qualified with a standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech." *Id.* at 320. For this reason, the court in *DeJohn* found that a policy restricting speech that creates a "'hostile or offensive environment' . . . . could encompass any speech that might simply be offensive to a listener, or a group of listeners,

believing that they are being subjected to or surrounded by

hostility." *Id.* Thus, the Third Circuit concluded that such

policy "cover[ed] much more speech than could be prohibited under

*Tinker's* substantial disruption test." *Id.*

Here, UVI's policy restricting speech that may "frighten,

demean, degrade, or disgrace" is similarly difficult to cabin.

While it is clear that speech amounting to "fighting words" would

not be protected, *see Chaplinsky v. New Hampshire,* 315 U.S. 568,

572-73, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), here, as in *DeJohn,*

Paragraph E encompasses much more speech than that which could

reasonably be found to cause a threat of substantial disruption.

*See Sypniewski,* 307 F.3d at 265 (explaining that "disruption for

purposes of *Tinker* must be more than the discomfort and

unpleasantness that always accompany an unpopular viewpoint"

(quotation omitted)).

Accordingly, the Court finds that Paragraph E is

unconstitutionally overbroad.

### III. Misbehavior at Sports Events, Concerts, and Social-Cultural Events

McCauley also challenges paragraph R of the Code ("Paragraph

R"), which prohibits as a major infraction "Misbehavior at Sports

Events, Concerts, and Social-Cultural Events," defined as

"[d]isplaying in the field house any, softball field, soccer

field, cafeteria and Reichhold Center for the Arts any
unauthorized or obscene, offensive or obstructive sign."
(Plaintiff's Ex. 1, Handbook and Code 38, ¶ R.)

The displaying of signs is certainly a form of expressive
speech. *See Naser Jewelers, Inc. v. City Of Concord, N.H.,*
513 F.3d 27 (1st Cir. 2008) ("Billboards and other signs are
protected by the First Amendment . . . ."). Paragraph R
restricts speech only in specified locations: the Field House,
softball field, soccer field, cafeteria and Reichhold Center for
the Arts." At first glance, this provision appears to be a
"place restriction," subject to intermediate scrutiny. *See
McTernan v. City Of York, PA,* 564 F.3d 636, 645 (3d Cir. 2009).
Significantly, however, the provision does not ban the displaying
of all signs in those locations, but only "unauthorized or
obscene, offensive or obstructive sign[s]." It does not ban all
speech in a certain place. Rather, the Misbehavior at Sports
Events provision restricts only certain signs based on their
content. Therefore, the restriction cannot be justified as a
content-neutral time, place, or manner restriction. *See Reno v.
ACLU,* 521 U.S. 844, 879, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)
("[T]ime, place and manner" analysis not applicable when statute
"regulates speech on the basis of its content"); *Pacific Gas &
Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 20, 106 S.Ct. 903,

89 L.Ed.2d 1 (1986) ("[F]or a time, place, or manner regulation

to be valid, it must be neutral as to the content of the

speech"); *Consolidated Edison Co. v. Public Serv. Comm'n,* 447

U.S. 530, 536, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) ("[A]

constitutionally permissible time, place, or manner restriction

may not be based upon either the content or subject matter of

speech").

To the extent Paragraph R bans the displaying of obscene

signs, such restriction is justified under *Fraser*. *See Saxe,* 240

F.3d at 213 (explaining that "*Fraser* permits a school to prohibit

words that offend for the same reasons that obscenity offends")

(quotations omitted).

On the other hand, to the extent Paragraph R bans

unauthorized or offensive signs, this portion of Paragraph R may

fall within the exception outlined in *Hazelwood* for school-

sponsored speech.  In *Hazelwood*, the Supreme Court upheld a

principal's deletion of student articles on teen pregnancy from a

school-sponsored newspaper against a First Amendment challenge.

The Court explained that the school had not opened the newspaper

up as a public forum and therefore could "exercis[e] editorial

control over the style and content of student speech in

school-sponsored expressive activities as long as [its] actions

are reasonably related to legitimate pedagogical concerns."

*Hazelwood School District,* 484 U.S. at 273. It reasoned that

> [t]he question whether the First Amendment
> requires a school to tolerate particular student
> speech-the question that we addressed in
> *Tinker*-is different from the question whether the
> First Amendment requires a school affirmatively
> to promote particular student speech. The former
> question addresses educators' ability to silence
> a student's personal expression that happens to
> occur on the school premises. The latter
> question concerns educators' authority over
> school-sponsored publications, theatrical
> productions, and *other expressive activities that
> students, parents, and members of the public
> might reasonably perceive to bear the imprimatur
> of the school.* . . . Educators are entitled to
> exercise greater control over this second form of
> student expression. . . .

*Id.* at 270-71 (emphasis added).

"*Hazelwood's* permissive 'legitimate pedagogical concern'

test governs *only when a student's school-sponsored speech could

reasonably be viewed as speech of the school itself.*" *Saxe,* 240

F.3d at 213-14 (emphasis added). As the Supreme Court explained

in *Rosenberger v. Rector & Visitors of University of Virginia*,

515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995):

> [W]hen the State is the speaker, it may make
> content-based choices. When the University
> determines the content of the education it
> provides, it is the University speaking, and we
> have permitted the government to regulate the
> content of what is or is not expressed when it is
> the speaker or when it enlists private entities
> to convey its own message. . . . It does not
> follow, however . . . that viewpoint-based

>      restrictions are proper when the University does
>      not itself speak or subsidize transmittal of a
>      message it favors but instead encourage[s] a
>      diversity of views from private speakers. A
>      holding that the University may not discriminate
>      based on the viewpoint of private persons whose
>      speech it facilitates does not restrict the
>      University's own speech, which is controlled by
>      different principles.

*Id.* at 834. Under this standard, "school sponsorship of student

speech is not lightly to be presumed." *Saxe,* 240 F.3d at 214.

Here, the University has not argued that the type of speech

prohibited by Paragraph R is school-sponsored. Nonetheless, the

Court recognizes that the displaying of signs by students in the

Field House, softball field, soccer field, cafeteria, or

Reichhold Center for the Arts may reasonably be viewed as speech

of the University itself. Furthermore, the Court finds that the

restrictions outlined in Paragraph R are reasonably related to

"legitimate pedagogical concerns." Indeed, the University has a

legitimate interest in controlling the messages contained on

signs displayed in the locations covered by Paragraph R.

Accordingly, the Court finds that Paragraph R is not

unconstitutionally overbroad.

>      **IV.  Verbal Assault, Lewd, Indecent, or
>            Obscene Conduct or Expressions on
>            University Owned or Controlled Property
>            or at University Sponsored or Supervised
>            Functions**

McCauley also challenges Section IV, paragraph B of the Code ("Paragraph B") prohibits as a general infraction "Verbal Assault, Lewd, Indecent, or Obscene Conduct or Expressions on University Owned or Controlled Property or at University Sponsored or Supervised Functions." (*Id.* at 39, ¶ B.) During the trial, the Court engaged in the following exchange with McCauley regarding Paragraph B:

> THE COURT: All right. Well, it speaks to "verbal assault, lewd, indecent or obscene conduct or," I guess, "obscene expressions on university-owned or controlled property."
>
> Is it -- are you saying that you wish to express yourself in an obscene, lewd, indecent manner, or verbally assault others on university property?
>
> That's what you're being deprived of?
>
> [MCCAULEY]: No, sir. I do not wish to do that.

(Trial Tr. 85-86, May 11, 2009.)

The Court finds that McCauley has failed to meet his burden of establishing how Paragraph B infringes upon his First Amendment rights. Accordingly, the Court will dismiss Count One with respect to Paragraph B.[8]

---

[8] Furthermore, to the extent Paragraph B bans lewd, indecent, or obscene speech, such restriction may be justified under *Fraser*.

## V. Conduct which Causes Emotional Distress

The final Code provision challenged by McCauley is Section IV, paragraph H of the Code ("Paragraph H"). Paragraph H bans as a minor infraction "Conduct which Causes Emotional Distress," which "includes conduct which results in physical manifestations, significant restraints on normal behavior or conduct and/or which compels the victim to seek assistance in dealing with distress." (*Id.* at 41, ¶ H.)

Unlike the provisions of Paragraphs E and R found to be unconstitutional, the prohibition embodied in Paragraph H is qualified. It restricts only speech of such a severe nature as to cause "physical manifestations," "significant restraints on normal behavior," or which "compels the victim to seek assistance in dealing with distress." Thus, Paragraph H does not restrict speech that is merely offensive to a listener. Rather, it is reasonable to assume that the type of speech encompassed by Paragraph H includes only speech that significantly interferes with the rights of others at the University. As such, the Court finds that Paragraph H satisfies *Tinker's* substantial disruption test.

### b.   Count Two: Freedom of Association

Count Two of McCauley's Complaint alleges that certain of the Code provisions violate his right to freedom of association.[9] However, at trial McCauley failed to present any evidence or argument explaining which provisions of the Code he believes violate his freedom of association, or how they infringe upon that freedom.  McCauley has also failed to include any discussion of the alleged infringement on his freedom of association in his proposed findings of fact and conclusions of law.  Under these circumstances, the Court finds that McCauley has waived his claims asserted in Count Two of the Complaint.

---

[9]   The First Amendment encompasses an independent right of freedom of association. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).  As the Supreme Court has explained,

> Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association. . . . It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.  Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and *state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny*.

*Id.* at 460-61 (emphasis added) (citations omitted).

### ii.  As-Applied Challenge

In his as-applied challenge, McCauley argues that the Hazing-Harassment policy of Paragraph E is unconstitutional as it was applied to him by the University.  However, because the Court has already determined that the challenged portions of Paragraph E are unconstitutional on their face, there is no need to reach the merits of his as-applied challenge to Paragraph E.

### C.    Damages

In addition to seeking a determination by the Court as to the constitutionality of the challenged Code provisions, McCauley requests an award of damages against the University.  The Court has already explained that McCauley's claims for damages against the Defendants in their official capacities must fail.  Furthermore, to the extent McCauley seeks damages against the Defendants in their individual capacities, such claims also fail because there has been no allegation or evidence of any personal involvement on the part of the Defendants in relation to McCauley's facial constitutional challenge.

### IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court will dismiss McCauley's claims against the University.  The Court will enter a Judgment declaring that Paragraph E is unconstitutional to the extent it prohibits speech that "frightens, demeans, degrades or disgraces any person."  The Court will enter an injunction banning the

Defendants from enforcing that portion of Paragraph E.  The Court

will enter judgment in favor of the Defendants as to the

remainder of McCauley's claims.  Pursuant to Federal Rule of

Civil Procedure 58(a), an appropriate Judgment follows.




                                   S_____
                                        **Curtis V. Gomez**
                                         **Chief Judge**